IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| CHARLES W. FRUNK, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 11-CV-19-PJC |
| ) | |
| MICHAEL J. ASTRUE, Commissioner of the ) | |
| Social Security Administration, ) | |
| ) | |
| Defendant. ) | |

**OPINION AND ORDER**

Claimant, Charles W. Frunk ("Frunk"), pursuant to 42 U.S.C. § 405(g), requests judicial review of the decision of the Commissioner of the Social Security Administration ("Commissioner") denying his applications for disability benefits under the Social Security Act. In accordance with 28 U.S.C. § 636(c)(1) and (3), the parties have consented to proceed before a United States Magistrate Judge. Any appeal of this order will be directly to the Tenth Circuit Court of Appeals. Frunk appeals the decision of the Administrative Law Judge ("ALJ") and asserts that the Commissioner erred because the ALJ incorrectly determined that he was not disabled. For the reasons discussed below, the Court **AFFIRMS** the Commissioner's decision.

**Claimant's Background**

Frunk was born on June 30, 1960 and was 49 years old at the time the decision on March 16, 2010. (R. 350, 355). He has a high school education. (R. 68). He had a business building, remodeling and repairing homes from 2000 until September 2008. (R. 55-56). Frunk alleges inability to work beginning September 5, 2008 due to right ankle and foot pain, foot ulcers, and

shoulder pain. (R. 31, 36-42).

Frunk testified that he has some problems with pain in his right shoulder that he dislocated in a motorcycle accident in 1981, but he was able to continue to work after that injury. (R. 40-41). He claims that pain from his right ankle and foot (and recurring ulcers) on that foot prevent him from being on his feet more than thirty minutes before having to take a 15-20 minute break. (R. 36-37). After a couple of hours, however, he must sit and elevate his feet. (R. 38-39). He testified that he takes medication for his diabetes and has no side effects from them. (R. 41).

Frunk described his daily activities as including sitting while watching TV or listening to the radio and cooking his breakfast. (R. 44). He sits in a chair with wheels so he can roll around the house and pick up a little and sweep. *Id*. Frunk mows on his riding lawn mower, though if the mower gets stuck, he cannot "get it unstuck." (R. 46). He drives about twice a week to Wal-Mart and Atwoods. (R. 62-63).

Frunk testified that he likes to hunt and fish and went five times in 2009 and fifteen or twenty times in 2008. *Id*. He tries to go every weekend to camp and when he hunts, he hunts with a muzzle loader, black powder rifle that weighs around twenty pounds. (R. 49-52). When hunting, he sets up and sits in a pop-up tent near his vehicle for a couple of hours. (R. 52-54). When he fishes, he sits with his right foot elevated. (R. 60).

The record reflects that Frunk was treated at the University of Oklahoma Clinic ("OU Clinic") from January 5, 2007 through September 17, 2008 for recovery from the amputation of his right big toe in December 2006 as a result of diabetes mellitus, and subsequent foot ulcers. (R. 232-65). On January 5, 2007, Frunk had a follow-up visit with his surgeon Matthew J. Sideman, M.D.. (R. 264). Dr. Sideman noted that the incision from the amputation of his toe

was healing very well.  *Id*.  During a follow-up visit on February 5, 2007, Dr. Sideman advised Frunk that although the amputation site on his right foot was healing, he should closely observe "both feet on a daily basis for ulcerations due to his diabetes and neuropathy." (R. 265).

On October 18, 2007, he reported fair control of his diabetes and that he was doing well and was active at work, but complained of cellulitis in his left leg, a diabetic foot ulcer and fatigue due to heat intolerance during the summer. (R. 248-52).  An x-ray taken on June 3, 2008 identified lateral dislocation in the right second and third metatarsophalageal joints with erosive changes. (R. 240).

Frunk was hospitalized at St. John Medical Center from September 5-19, 2008 for treatment of a draining ulcer and infection in his right foot, and subsequent surgery. (R. 275-307).  A MRI taken of his right foot indicated suspicion "for osteomyelitis of the distal phalanges of the fourth and second toes," though more likely indicative of neuroarthropathy and "degenerative changes of the second and third metatarsophalangeal joints with lateral dislocations." (R. 303-04).  He was seen by consulting orthopedic surgeon, Wesley Stotler, D.O., on September 9, 2008 for his foot ulcerations and osteomyelitis in his second and fourth toes. (R. 233-34).  Dr. Stotler noted that Frunk had a club foot deformity with a Charcot process throughout his mid-right-foot area, severe clawing of his lesser toes with the third toe barely touching the floor.  *Id*.  Dr. Stotler recommended the partial amputation of the second and fourth toes to allow Frunk to continue "ambulation in the future."  *Id*.  Frunk underwent surgery on his right foot on September 17, 2008 when Dr. Stotler amputated the second and third toes at the middle phalanx level. (R. 267-68, 289-90).  Frunk's discharge diagnosis was right second and fourth toe osteomyelitis, status post partial amputation of those toes, diabetes mellitus and hypertension. (R. 275-77).

3

Frunk presented again to the OU Clinic on December 18, 2008 with another right foot ulcer and was seen by Jeannette Power, M.D. (R. 344-53). Noting that Frunk owned and worked in a construction business, Dr. Power recommended that Frunk try to obtain disability benefits due to his "severe neuropathy and repeated infections." (R. 345). She also completed a Handicapped Parking Placard Application, checking the box which stated that the applicant "[i]s severely limited in his or her ability to walk due to an arthritic neurological, or orthopedic condition, or complications due to pregnancy." (R. 181).

On January 22, 2009, Frunk was again seen by Dr. Stotler. (R. 343). Dr. Stotler noted that Frunk's right foot had "recovered well" from the partial toe amputations but that he had developed an ulcer under the fourth metatarsal head. *Id*. He prescribed Accuzyme and an Ortho wedge shoe to wear and scheduled him for a follow-up visit in two weeks to determine whether a debridement would be necessary. *Id*. In Frunk's follow-up visits in February, Dr. Stotler noted the continued healing of the ulcer. (R. 341-42). However, Frunk's medical records from the Neighbor for Neighbor Clinic indicate that Frunk continued to have problems with the right foot ulcer throughout 2009. (R. 354-75).

On November 13, 2009, Frunk went to the emergency room at St. John for treatment of an abscess on his right foot. (R. 376-85). Rocky Morgan, M.D., diagnosed him with a chronic pressure ulcer on the plantar surface of the first metatarsal head. (R. 380). An x-ray of his foot showed degenerative changes including indications of chronic dislocation with joint deformity in the second and third metatarsal phalangeal joints as well as chronic periostitis at the base of the metatarsals. (R. 385). And on January 8, 2010, Dr. Morgan performed a right first metatarsal head resection on the right foot to treat the nonhealing ulcer. (R. 387-89).

A Physical Residual Functional Capacity Assessment ("PRFCA") was completed by

4

DDS non-examining physician, Luther Woodcock, M.D. on November 10, 2008. Dr. Woodcock found that Frunk could lift/carry ten pounds occasionally and less than ten pounds frequently, stand/walk at least two hours in an eight-hour workday, sit about six hours in an eight-hour workday and had no limitation in pushing or pulling. (R. 331). Dr. Woodcock based his findings on the following:

> Claimant is a 48 year old male who alleges diabetes neuropathy. He had a right foot infection with a draining ucler [sic]. His right second toe and 4th toe had osteomyelitis and were partial [sic] amputated on 09/17/08. Follow-up from 09/19/08 indicate [sic] that he is stable and healing nicely and can walk with crutches. Follow up 10/08 at the OU internal Medicine clinic shows this is healing.

(R. 331). On February 20, 2009, non-examining DDS physician Kenneth Wainner, M.D., reviewed all the medical evidence in the file as of that date and affirmed Dr. Woodcock's November 10, 2008 assessment. (R. 338).

## Procedural History

On September 24, 2008, Frunk filed applications for disability insurance benefits and supplemental security income. (R. 139-46). In these applications, he alleged disability beginning September 5, 2008. These applications for benefits were denied in their entirety initially and on reconsideration. (R. 78-79, 81-82). A hearing before ALJ Jeffrey S. Wolfe was held January 21, 2010 in Tulsa, Oklahoma. (R. 26-77). By decision dated March 16, 2010, the ALJ found that Frunk was not disabled at any time through the date of the decision. (R. 12-21). On November 18, 2010, the Appeals Council denied review of the ALJ's findings. (R. 1-5). Thus, the decision of the ALJ represents the Commissioner's final decision for purposes of further appeal. 20 C.F.R. §§ 404.981, 416.1481.

## Social Security Law and Standard of Review

Disability under the Social Security Act is defined as the "inability to engage in any

substantial gainful activity by reason of any medically determinable physical or mental impairment." 42 U.S.C. § 423(d)(1)(A).  A claimant is disabled under the Act only if his "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work in the national economy." 42 U.S.C. § 423(d)(2)(A). Social Security regulations implement a five-step sequential process to evaluate a disability claim.  20 C.F.R. § 404.1520.[1]  *See also Williams v. Bowen*, 844 F.2d 748, 750 (10th Cir. 1988) (detailing steps).  "If a determination can be made at any of the steps that a claimant is or is not disabled, evaluation under a subsequent step is not necessary." *Williams*, 844 F.2d at 750.

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g).  This Court's review is limited to two inquiries: first, whether the decision was supported by substantial evidence; and, second, whether the correct legal standards were applied. *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004) (quotation omitted).

Substantial evidence is such evidence as a reasonable mind might accept as adequate to support a conclusion. *Id.* The court's review is based on the record taken as a whole, and the

---

[1]   Step One requires the claimant to establish that he is not engaged in substantial gainful activity, as defined by 20 C.F.R. §§ 404.1510, 416.972.  Step Two requires that the claimant establish that he has a medically severe impairment or combination of impairments that significantly limit his ability to do basic work activities. *See* 20 C.F.R. §§ 404.1520(c), 416.920(c).  If the claimant is engaged in substantial gainful activity (Step One) or if the claimant's impairment is not medically severe (Step Two), disability benefits are denied.  At Step Three, the claimant's impairment is compared with certain impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App.1 ("Listings").  A claimant suffering from a listed impairment or impairments "medically equivalent" to a listed impairment is determined to be disabled without further inquiry.  If not, the evaluation proceeds to Step Four, where the claimant must establish that he does not retain the residual functional capacity ("RFC") to perform his past relevant work.  If the claimant's Step Four burden is met, the burden shifts to the Commissioner to establish at Step Five that work exists in significant numbers in the national economy which the claimant, taking into account his age, education, work experience, and RFC, can perform. *See Dikeman v. Halter*, 245 F.3d 1182, 1184 (10th Cir. 2001).  Disability benefits are denied if the Commissioner shows that the impairment which precluded the performance of past relevant work does not preclude alternative work. 20 C.F.R. §§ 404.1520, 416.920.

court will "meticulously examine the record in order to determine if the evidence supporting the agency's decision is substantial, taking 'into account whatever in the record fairly detracts from its weight.'" *Id., quoting Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994). The court "may neither reweigh the evidence nor substitute" its discretion for that of the Commissioner. *Hamlin,* 365 F.3d at 1214 (quotation omitted).

## Decision of the Administrative Law Judge

The ALJ found that Frunk met the insured status requirements through March 30, 2012. (R. 14). At Step One, the ALJ found that Frunk had not engaged in any substantial gainful activity since his alleged onset date of September 8, 2008. *Id.* At Step Two, the ALJ found that Frunk had severe impairments of diabetes, diabetic neuropathy, and status-post partial amputation of two toes on the right foot. *Id.* At Step Three, the ALJ found that Frunk's impairments did not meet any Listing, specifically, Listings §§1.03 and 9.08. *Id.* The ALJ determined that Frunk had the RFC to do a full range of sedentary work. *Id*. At Step Four, the ALJ found that Frunk could not return to his past work. (R. 19). At Step Five, the ALJ found that there were jobs that a person with Frunk's RFC, age, education, and work experience could perform. *Id.* Therefore, the ALJ found that Frunk was not disabled at any time through the date of his decision. (R. 20).

## Review

Frunk asserts that the ALJ erred in failing to (1) make a proper determination at Steps Four and Five of the sequential evaluation process; (2) perform a proper evaluation of the medical source opinions; and (3) perform a proper credibility determination. The Court finds that substantial evidence supports the ALJ's decision and the decision complies with legal requirements. Therefore, the ALJ's decision is **AFFIRMED**.

7

**(1) Steps Four and Five**

Frunk argues that the ALJ failed to make a proper determination at Steps 4 and 5 by failing to include the required strength demands in his hypothetical to the Vocational Expert ("VE"), Connie Brasher Ward ("Ward"). Frunk argues that the ALJ erred in having the VE review the PRFCA setting forth the limitations found by DDS physicians Dr. Woodcock and Dr. Wainner rather than have the ALJ recite them on the record. He contends that Ward's determination that a person with the PRFCA limitations could perform a full range of sedentary work was inappropriately made in her head and, therefore, there is nothing to review. Finally, Frunk complains that the VE did not consider Frunk's education, age and ability to read and write. The Court disagrees.

The ALJ found that Frunk had the RFC to perform "the full range of sedentary work, as defined in 20 CFR 404.1567(a) and 416.967(a)." These provisions identify sedentary work as follows:

> Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

20 CFR §§404.1567(a) and 416.967(a). In making his RFC finding, the ALJ considered and thoroughly discussed Frunk's testimony and credibility, the "objective medical evidence," and the PRFCA found by DDS physicians Dr. Woodcock and Dr. Wainner, concurring with their opinions that Frunk could perform sedentary work. (R. 16-19)

In his examination of the VE, the ALJ first asked Ward about Frunk's past work as a carpenter and maintenance mechanic, which Ward identified as jobs requiring heavy exertional levels. (R. 66-67). Ward then identified Frunk's transferrable skills from his past work as

"knowledge of construction and repair, using tools, estimating materials, ordering materials and dealing with the public and supervision," finding the skills of "dealing with the public, estimating materials and ordering materials" transferrable to the sedentary level.[2] (R. 67). The ALJ asked Ward to review Exhibit 4F, the PRFCA completed by Dr. Woodcock and affirmed by Dr. Wainner, and identify and summarize it. (R. 68). Ward responded: "It is a physical residual functional capacity assessment from DDS. It would put a person at the sedentary level of work, full range of sedentary work."[3] *Id*.    The ALJ then asked Frunk about his educational background, which Frunk identified as a high school education and on-the-job training. *Id*. And the following exchange between the ALJ and Ward resulted:

> Q. And so Mrs. Ward, if we consider *an individual of the same age, education and work experience as Mr. Frunk*, *who is limited as described at exhibit 4F,* can such an individual perform Mr. Frunk's past work?
> A. No Your Honor.
> Q. Because the exertional levels are too great?
> A. Yes.
> Q. Okay. And are there other less demanding jobs such an individual could perform?
> A. The, on the sedentary, semiskilled level, the jobs that I believe these skills would transfer to would be that of an order clerk, this is sedentary semiskilled with an SVP of 4, nationally there's approximately 98,000 . . .

Ward continued, identifying sedentary, unskilled jobs of order clerk, maintenance dispatcher, clerical mailer, and semiconductor assembler that a person with the limitations set forth in the PRFCA and the same education, age, work experience as Frunk could perform, as well as their DOT numbers and their corresponding numbers of national and Oklahoma jobs.

---

[2] On examination by Frunk's counsel, Ward later testified that knowledge of maintenance would be transferrable to the sedentary job of maintenance dispatcher. (R. 73-74).

[3] As noted above, Dr. Woodcock found that Frunk could lift/carry ten pounds occasionally and less than ten pounds frequently, stand/walk at least two hours in an eight-hour workday, sit about six hours in an eight-hour workday and had no limitation in pushing or pulling. (R. 331). These limitations are consistent with the performance of sedentary work.

The Court finds no error at Steps Four and Five. The RFC found by the ALJ was identical to the PRFCA the ALJ asked Ward to consider (along with Frunk's age, education and work experience and transferrable skills) in forming her opinion that Frunk could not perform his past work as a carpenter and maintenance mechanic but could perform the full range of sedentary work, including jobs of order clerk, maintenance dispatcher, clerical mailer, and semiconductor assembler. The Court finds that ALJ's hypothetical included all the limitations supported by the record and the VE's opinion constitutes substantial evidence supporting the ALJ's finding that Frunk was not disabled.

### (2) Evaluation of medical source opinions

Frunk asserts that the ALJ erred in ignoring Dr. Power's recommendation that Frunk try to obtain disability benefits due to his "severe neuropathy and repeated infections" as well as her opinion in the Handicapped Parking Placard Application, and in failing to explain the weight he gave to Frunk's treating physicians' and the agency physicians' opinions.

A treating physician opinion must be given controlling weight if it is supported by "medically acceptable clinical and laboratory diagnostic techniques," and it is not inconsistent with other substantial evidence in the record. *Hamlin v. Barnhart*, 365 F.3d 1208, 1215 (10th Cir. 2004); *see also* 20 C.F.R. §§ 404.1527(d)(2) and 416.927(d)(2). Even if the opinion of a treating physician is not entitled to controlling weight, it is still entitled to deference and must be weighed using the appropriate factors set out in Sections 404.1527(d) and 416.927(d). *Langley v. Barnhart*, 373 F.3d 1116, 1119 (10th Cir. 2004). The ALJ is required to give specific reasons for the weight he assigns to a treating physician opinion, and if he rejects the opinion completely, then he must give specific legitimate reasons for that rejection. *Id.* When a treating physician's opinion is inconsistent with other medical evidence, it is the job of the ALJ to examine the other

medical reports to see if they outweigh the treating physician's report, not the other way around. *Hamlin*, 365 F.3d at 1215 (quotation omitted).

Frunk argues that the ALJ improperly ignored Dr. Power's December 18, 2008 recommendation in his evaluation of medical opinions. The recommendation was as follows:

> Due to [Frunk's] severe neuropathy and repeated infections, I had recommended that he try and obtain disability. ([Frunk] works in construction and owns his own business). [Frunk] states that he is attempting to get disability. It is dif[ficult] to work due to his severe peripheral neuropathy. [Frunk complains] of swelling in his r[ight] foot, he notices esp[ecially] everytime he is walking. Elevating the foot helps.

(R. 345, 347).

This recommendation, however, is not a medical opinion. A "true medical opinion" is one that contains a doctor's "judgment about the nature and severity of [the claimant's] physical limitations, or any information about what activities [the claimant] could still perform." *Cowan v. Astrue,* 552 F.3d 1182, 1188-89 (10th Cir. 2008). Thus, the Tenth Circuit in *Cowan* found that a statement by a treating physician that the claimant had a stroke "and I feel he may never return to work" was not a true medical opinion. *Id.*; s*ee also Martinez v. Astrue,* 316 Fed. Appx. 819, 822-23 (10th Cir. 2009) (ALJ did not need to provide specific legitimate reasons for rejecting portion of treating physician's letter that contained only generalized statements); *Mann v. Astrue*, 284 Fed. Appx. 567, 570 (10th Cir. 2008) (treating physician recommendation that the claimant see an orthopedic specialist was not a treating physician opinion because it did not address functional limitations). Further, it appears that Dr. Power was suggesting that Frunk apply for disability given his current job as a construction worker, work performed at the heavy exertional level and not the sedentary level.

Neither does the Court find reversible error in the ALJ's failure to discuss Dr. Power's opinion in the Handicapped Parking Placard Application. As noted above, Dr. Power checked

11

the box on the application that stated that the applicant "[i]s severely limited in his or her ability to walk due to an arthritic, neurological, or orthopedic condition, or complications due to pregnancy." (R. 181). While it would have been preferable for the ALJ to have addressed the parking application, the Court finds that the oversight is not reversible error in this case as nothing in the checked box precludes the ALJ's finding that Frunk was capable of doing sedentary work. *Parmley v. Astrue*, 2008 WL 3850250 (E.D. Ky. August 15, 2008) ("The ALJ is not bound by a treating physician's conclusory statement [checking a box on the handicap parking that the claimant was 'permanently disabled'], particularly where the ALJ determines, as she did in this case, . . . there is medical proof that Plaintiff retains the RFC to work in some capacity other than [his] past work.").[4]

Finally, the Court finds that the ALJ properly weighed and discussed the medical opinions in the record. The ALJ stated that he gave "considerable weight" to the PRFCA of agency physicians, Drs. Woodcock and Wainner. (R. 19, 331-38). The ALJ also discussed the medical evidence in the record at length - "the records from OU Clinic, St. John Medical Center, Tulsa Bone and Joint, Neighbor for Neighbor and Dr. Morgan"- and gave them "substantial

---

[4] Frunk argues that this is a post-hoc rationalization. A reviewing court "may not create or adopt post-hoc rationalizations to support the ALJ's decision that are not apparent from the ALJ's decision itself." *Haga v. Astrue*, 482 F.3d 1205, 1207-08 (10th Cir. 2007). Here, however, the ALJ's failure to discuss the parking placard application is analogous to the failure of the ALJ to discuss the claimant's cardiac problems in *Big Pond v. Astrue*, 280 Fed. Appx. 716, 719 n.2 (10th Cir. 2008). There, the Tenth Circuit rejected an argument that the Commissioner engaged in *post hoc* justification of the ALJ's decision when the issue raised by the claimant was that the ALJ had failed to discuss her cardiac problems:

> We have simply reviewed the record in order to determine whether, and then to illustrate why, the ALJ's omissions were not legal error. The ALJ was not required to provide grounds in the decision for failing to do what was not required. Thus, neither we nor the Commissioner have relied on a substitute rationale for upholding the ALJ's decision.

*Id*.

12

weight." (R. 18-19). The Commissioner cites nothing in these medical records that is inconsistent with the ALJ's RFC finding and the Court finds none.

### (3) Credibility Determination

Frunk contends that the ALJ failed to conduct a proper credibility analysis by using "meaningless boilerplate" in his determination, failing to properly assess Frunk's activities of daily living ("ADLs"), finding that Frunk had no reaction to his medications and was not in compliance with his treatment for diabetes, and ignoring Frunk's dislocated shoulder, his use of a rolling chair to get around the house and his past relevant work. The Court finds no error in the ALJ's credibility analysis and determination.

Credibility determinations by the trier of fact are given great deference. *Hamilton v. Secretary of Health & Human Services,* 961 F.2d 1495, 1499 (10th Cir. 1992).

> The ALJ enjoys an institutional advantage in making [credibility determinations]. Not only does an ALJ see far more social security cases than do appellate judges, [the ALJ] is uniquely able to observe the demeanor and gauge the physical abilities of the claimant in a direct and unmediated fashion.

*White v. Barnhart,* 287 F.3d 903, 910 (10th Cir. 2001). In evaluating credibility, an ALJ must give specific reasons that are closely linked to substantial evidence. *See Kepler v. Chater*, 68 F.3d 387, 391 (10th Cir. 1995); Social Security Ruling 96-7p, 1996 WL 374186.

The Commissioner objects that the following credibility analysis is "meaningless boilerplate":

> After careful consideration of the evidence, I find that Mr. Frunk's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, Mr. Frunk's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the foregoing residual functional capacity assessment.

(R. 18). The Court agrees that this statement alone would be insufficient. However, this is the ALJ's ultimate credibility finding, not his credibility analysis.

First, the credibility finding does not consist only of the above, as Frunk suggests, as it continues with the following statements:

> In other words, despite Mr. Frunk's claims of an inability to function in the competitive workplace, he can hunt, fish, even doing so from a boa[t] on the lake. The objective medical supports a conclusion that while Mr. Frunk is limited, he is not completely disabled.

(R. 18). *See also Mann v. Astrue*, 284 Fed. Appx. 567, 571 (10th Cir. 2008) (finding credibility determination adequate when ALJ discussed three points).

Second, the ALJ undertook a thorough analysis of Frunk's testimony and the objective medical evidence to support this credibility finding. In making his credibility determination, the ALJ properly considered and discussed Frunk's testimony regarding his subjective complaints and ADLs, the objective medical findings and treatment history, physician's opinions and Frunk's noncompliance with prescribed treatment. (R. 16-19).

Frunk, nonetheless, complains that the ALJ ignored a medical report on October 17, 2007 noting that Frunk "felt bad and shaky" when he tried to increase his Levemir by two units as directed. (R. 250). However, that same report stated that Frunk reported "fair control" of his diabetes with his medication and was "active at work" and had an "active lifestyle." (R. 249, 251).

Frunk also objects to the ALJ's statement that there was evidence of noncompliance with medical treatment when none of Frunk's physicians accused him of noncompliance. Actually, the ALJ correctly stated that there were "several indications of non-compliance in the records, concerning [Frunk's] diabetes." (R. 18). For example, the medical record shows that Frunk had "a history of not following diabetic diet in the past year since diagnosed" (R. 238, 319), took "no insulin for one week" (R. 262), and "was not wearing his off-loading shoe" (R. 341).

14

Further, contrary to Frunk's objections, the ALJ did consider and discuss that Frunk dislocated his right shoulder in 1981, and he correctly noted that Frunk had been able to work since then. (R. 17). And he also considered that Frunk "can cook breakfast, 'pick up a little' (like clothes), and do 'a little sweeping' *while sitting in a chair with wheels*." *Id*. (emphasis added).

Finally, Frunk complains that the ALJ ignored that the file is incomplete regarding Frunk's past relevant work and that a "good work history enhances one's credibility." Even though a good work history can be a factor to consider in assessing credibility, it is certainly not a necessary one. And, if the file is "incomplete" regarding his past relevant work, Frunk never asked for further development of the record regarding it.

In sum, the ALJ's credibility determination was supported by specific reasons linked to substantial evidence, and the Court therefore finds that it should be affirmed.

## Conclusion

The decision of the Commissioner is supported by substantial evidence and the correct legal standards were applied. The decision is **AFFIRMED**.

Dated this 30th day of January, 2010.

_____
Paul J. Cleary
United States Magistrate Judge